The undersigned have reviewed the award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon reconsideration of the evidence as a whole, the undersigned reach different facts and conclusions from those reached by the deputy commissioner. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their own findings of fact, conclusions of law, and ultimate award. Accordingly, the May 27, 1997, opinion and award by Deputy Commissioner Dollar is HEREBY VACATED.
The Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties in their pre-trial agreements, which were filed on July 5 and 8, 1996, and at the initial hearing, as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case. The parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured, with Crawford Company as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The plaintiff's average weekly wage was $248.00, which yields a compensation rate of $165.33.
5. Over the course of her employment with the defendant, the plaintiff complained of problems with her hands.
6. The issues for determination are:
 a. Whether the plaintiff has contracted a compensable occupational disease; and if so, to what benefits may she be entitled under the Act,
 b. Whether the plaintiff's claims for benefits should be barred due to her failure to file her claim within two years, in accordance with N.C. Gen. Stat. § 97-58, and
 c. Whether the plaintiff sought unauthorized treatment; and if so, should defendant be required to pay for such treatment.
7. The parties stipulated the following exhibits into the record:
 a. Medical Records of Drs. Saunders, Timmons, Bloem, Kahn, Hansen, Magness, Hamilton, and Deloatch;
b. Short-term disability records, two pages;
c. Records of Bertie County Schools, eight pages; and
 d. Records of Roanoke-Chowan Mental Health, four pages.
 ***********
Based upon all of the competent, credible, and convincing evidence adduced from the record, the undersigned make the following additional
 FINDINGS OF FACT
1. At the time of the initial hearing, the plaintiff was a forty-six year old female who began working for the defendant-chicken processor on April 21, 1982. In 1990, the plaintiff was diagnosed with diabetes.
2. Prior to beginning work with the defendant, the plaintiff was treated by Dr. Fred Saunders, her family doctor, on June 17, 1981 for complaints of right arm numbness, and pain and paresthesias in her middle and ring fingers. At that time, she was diagnosed with right carpal tunnel syndrome. In 1982, Dr. Saunders began treating the plaintiff for bilateral carpal tunnel syndrome.
3. During her employment with the defendant, the plaintiff worked as a trimmer, filleter, packer, and checker. The trimmer job required the plaintiff to use a knife to remove excess fat and skin from the pieces of chicken. The fillet job required the plaintiff to use a knife and scissors to cut skin and bones from chicken breast fillets. She would then use her hands to pull the skin and bones from the piece of meat. The plaintiff performed these jobs, which were repetitive motion jobs, from 1983 to 1991. Shortly after beginning the trimmer job, the plaintiff complained of swelling in her right wrist and elbow; and she went to Dr. Saunders for treatment. The plaintiff next worked as a packer, where she packed chicken breasts and tenderloins in trays.
4. Dr. Saunders referred the plaintiff to Dr. Robert Timmons, a neurologist, in 1983, where she was seen on September 7, 1983. Dr. Timmons diagnosed the plaintiff with bilateral carpal tunnel syndrome related to the strenuous use of her hands on the job at Perdue. He recommended a surgery to divide the right transverse carpal ligament. However, the plaintiff decided to forgo surgery for a job modification.
5. The plaintiff next sought treatment for her hand pain from Dr. Melvin Clayton, an internist, who in May of 1991 referred her to Dr. J. Bloem, an orthopedic surgeon. Due to plaintiff's diabetes, Dr. Bloem recommended conservative treatment, and noted that if plaintiff's blood sugar was adequately controlled, she may see a decrease in her carpal tunnel symptoms. On July 31, 1991, Dr. Bloem found that the plaintiff was doing better and could remain in her normal job, but should not perform work which required her to use scissors or had too many repetitive actions. The plaintiff did not return to Dr. Bloem for further treatment after that visit.
6. Starting in 1992 or 1993, the defendant began rotating employees in the department on various jobs. Plaintiff would work on a job in twelve minute segments, in order to attempt to vary the type of hand motions. However, the motion was still repetitive in one form or another.
7. The plaintiff next saw Dr. Colin Jones at the defendant's Wellness Center for treatment of her hands on December 22, 1992. She had follow-up visits in December and January and was diagnosed with ulnar nerve compression and carpal tunnel syndrome caused by repetitive motion. On April 22, 1993, the plaintiff saw Dr. Robert Hansen, a neurologist who holds office hours at the defendant's Wellness Center. At that time, the plaintiff related a history of right arm and shoulder pain, as well as pain in her fourth and fifth fingers. After conducting nerve studies, Dr. Hansen found plaintiff to have mild generalized sensomotor peripheral neuropathy and bilateral median neuropathies which were likely due to her diabetes and which would put her at risk for development of multiple entrapment neuropathies.
8. Dr. Hansen referred plaintiff to Dr. Robert Kahn, a general surgeon, who saw her on September 14, 1993, for the right carpal tunnel syndrome. On October 18, 1993, Dr. Kahn performed a right carpal tunnel release and ulnar nerve transposition on the right elbow. The plaintiff was released to light duty on December 6, 1993, and regular duty on January 5, 1994.
9. During plaintiff's absence from October 18, 1993 to December 7, 1993, she was placed on a non-work related leave of absence, as the defendant was under the belief that the surgeries were due to plaintiff's diabetes, as defendant had been advised by Dr. Hansen. The plaintiff received short-term disability benefits through an employer-funded plan, in the amount of $190.00 per week.
10. The plaintiff returned to work as a checker, which required her to lift two trays of breasts off the production line, check pieces of meat for bone chips, and return the tray to the line. The plaintiff did the checker job at her own pace, and she still complained of pain in her hand and elbow.
11. On January 13, 1994, the plaintiff returned to Dr. Hansen, complaining of numbness and pain in her right hand since surgery. A repeat EMG showed the right median neuropathy had worsened since the EMG in 1993.
12. On February 24, 1994, Dr. Hansen saw plaintiff at which time she complained of pain in the right hand and forearm. A third EMG study showed moderately severe median neuropathies bilaterally. Dr. Hansen referred the plaintiff to Dr. Alfred Magness, a neurosurgeon. Dr. Magness would not authorize plaintiff to remain out of work, despite her symptoms.
13. The plaintiff returned to Dr. Hansen on April 7, 1994, complaining of her right hand. Dr. Hansen ordered aggressive rehabilitation and physical therapy. However, Dr. Hansen also would not authorize the plaintiff to remain out of work. Although both Drs. Hansen and Magness directed the plaintiff to return for follow-up, she failed to return to either physician.
14. In April of 1994, the plaintiff sought treatment on her own from Dr. Meredith Anthony, a family practitioner, who finally removed the plaintiff from work. This was reported to the employer, and was treated as a non-work related leave of absence. The plaintiff again received short-term disability payments through the employer-funded plan. She drew twenty-six weeks of benefits through late December of 1994, for a total of $4,131.50. The plaintiff remained on leave of absence for one year, through April of 1995, at which time her employment with the defendant ended, in accordance with the defendant's policy on leaves of absence.
15. On August 12, 1994, the plaintiff was referred by Dr. Anthony to Dr. Gene Hamilton, an orthopedic surgeon. The plaintiff received splints and injections for the right arm pain. After the plaintiff refused surgery on the right arm, Dr. Hamilton released her from his treatment.
16. On June 9, 1995, the plaintiff returned to Dr. Hamilton with complaints of right knee pain, which the doctor related to osteoarthritis. This was not related to her work at Perdue.
17. Plaintiff suffers from the occupational disease of bilateral carpal tunnel syndrome. While plaintiff does suffer from diabetes, which makes her more susceptible to carpal tunnel injury, her condition was aggravated to an additive degree by the repetitive motion activities she performed while working with defendant-employer.
18. Plaintiff's employment with defendant-employer and the repetitive job duties which she performed placed her at an increased risk for contracting bilateral carpal tunnel syndrome to which the general public is not equally exposed.
19. Plaintiff timely filed her claim with the Industrial Commission within two years of learning the probable work-relatedness of her condition. She filed her Form 33 Request for Hearing on March 25, 1996 in I.C. No. 426409 and her Form 18 in I.C. No. 579391 in October of 1995. Plaintiff was given conflicting opinions by her doctors as to the job relatedness of her claim. Plaintiff was finally taken out of work indefinitely by Dr. Meredith Anthony on April 15, 1994. Further, defendant paid plaintiff from an employer-funded short term medical disability plan as a non-related injury even from June 10, 1994 through December, 1994, for a total of $4,131.50, in addition to a short period of two months in 1993, for which she was paid $190.00 per week in short-term disability.
20. Beginning June 10, 1994, the last day plaintiff actually worked for defendant-employer, she has been disabled from the same or any other employment due to her compensable, work-related condition. She has not yet reached maximum medical improvement and requires further and future medical treatment as a result of her compensable occupational disease.
21. The treatment by Dr. Meredith Anthony and Dr. Gene Hamilton, although not authorized by defendant-employer, was reasonably required to effect a cure and give relief.
The foregoing stipulations and findings of fact engender the following
 CONCLUSIONS OF LAW
1. Plaintiff suffers from the compensable occupational disease of bilateral carpal tunnel syndrome. G.S. § 97-53(13).
2. As a result of her compensable occupational disease, she has been unable to work at her same or at any other employment since June 10, 1994; and thus she is entitled to temporary total disability in the amount of $165.33, from that date and continuing until further order of the Commission, subject to a credit of $4,131.50, paid by defendant-employer under an employer-funded short term disability plan during this period of time, and subject to a reasonable attorney's fee. G.S. § 97-29.
3. As a result of her compensable occupational disease, plaintiff is further entitled to such medical treatment as is related to her bilateral carpal tunnel syndrome to the extent such treatment effects a cure, gives relief, or lessens her period of disability.
The foregoing stipulations, findings of fact, and conclusions of law, engender the following
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation in the amount of $165.33 per week beginning June 10, 1994, and continuing until further order of the Commission, subject to the reasonable attorney's fee awarded below. Such amounts as have accrued shall be paid in a lump sum, subtracting the $4,131.50 credit due defendant, and subject to the attorney's fee awarded below on the remaining sum.
2. Defendant shall pay all medical expenses incurred or to be incurred by the plaintiff as a result of her compensable occupational disease, once bills for the same have properly been submitted for approval.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee in the amount of twenty-five percent (25%) of the accrued net sum due plaintiff; and afterwards, every fourth check due plaintiff shall be forwarded directly to plaintiff's attorney as a reasonable attorney's fee.
4. Defendant shall pay the costs.
This case is ORDERED REMOVED from the Full Commission hearing docket.
This the ___ day of ___, 1998.
 S/ ________________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ______________________ CHRISTOPHER L. SCOTT COMMISSIONER
DISSENTING:
S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER